Modified.

30 C.C.P.A. (Patents)

## In re GILLETT.

### Patent Appeal No. 4675.

Court of Customs and Patent Appeals.

Feb. 1, 1943.

John H. Leonard, of Cleveland, Ohio (Donald A. Gardiner, of Washington, D. C., and George M. Soule, of Cleveland, Ohio, of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner rejecting in view of the prior art all of the claims, 14 to 17 inclusive and 19 and 20, of an application for a patent for an alleged new and useful improvement in "Low Alloy, High Tensile Steel and Method of Making Same." The involved claims are article claims, of which claim 14 is illustrative:

"14. A high tensile, low alloy steel comprising essentially carbon .05 to .20%, manganese .08 to 1.30%, phosphorus .085 to .15%, silicon from a trace to .08%, the balance of said alloy being substantially all iron with the usual impurities, the amount of carbon and phosphorus not exceeding a total of 0.28% and the amounts thereof being varied in inverse relation to each other, and said alloy steel being unkilled."

The references relied on are:

British patent 390,255, April 6, 1933.

Metals Handbook, 1939 Edition, pages 786 and 787.

The alleged invention relates to a low alloy, high tensile steel which is not "killed" although it contains ingredients which are killing agents. It is alleged that such steel is the first and only known "rimmed" or "semi-killed" low alloy, high tensile steel. Those steels are known as "unkilled". It is stated to be generally useful for automobile frames, structural steel forms, tanks and the like.

The British patent relates to a steel suitable for objects subjected to heavy wear, such as railroad rails, wheel tires, sheet piling, etc., and it describes and claims a steel comprising "carbon in amounts less than 0.2%, from 0.7 to 1.6% of manganese, from 0.08 to 0.25% of phosphorus and less than 0.6% of silicon, the remainder being iron."

The Metals Handbook reference defines the meaning of "killed", "semi-killed", and "rimmed" steels. That reference was cited for the purpose of showing that those steels were well known in the art.

The Board of Appeals defined unkilled steel as follows: " 'Unkilled' is a technical term of the steel industry meaning that no metal or alloy having a high affinity for oxygen is added to the bath, with the object of abstracting oxygen and throughly

[sic] reducing any iron oxides as well as others present."

In rejecting the involved claims as lacking invention over the cited prior art, the examiner held that the British patent shows it is old in the art to produce steel of great mechanical strength and toughness by employing alloying components which fall within the range disclosed and claimed in the application. To illustrate that holding the examiner set out in his statement the range of the steel components of the British patent and that of claim 14 herein as follows:

British patent:

| C | Mn | P | Si | Fe |
|---|----|---|----|----|
| less than .2% | .7 to 1.6% | .08 to .25% | less than .6% | Bal. |

Claim 14:

| C | Mn | P | Si | Fe |
|---|----|---|----|----|
| .05 to .2% | .8 to 1.3% | .085 to .15% | to .08% | Bal. |

The examiner observed that both manganese and silicon are killing agents in the making of steel, and that it would be obvious to use a smaller quantity of silicon as the amount of manganese might be increased in order to produce steel in an unkilled state, and that silicon when used in the production of such steel is always in amounts sufficiently small to leave the steel unkilled.

The examiner succinctly stated his reasons for rejecting the involved claims in the following language:

"Since only the upper limit of silicon is given in the British patent it is clear that this element does not vitally affect the essential properties of the alloy so that it may be used in very small amounts or it may be entirely omitted, thus leaving the steel in the unkilled state just like the applicant's steel. It is therefore believed, that claim 14, as well as the remaining claims, which recite alloy steels falling squarely within the range disclosed in the British patent, were properly rejected as met completely thereby because by specifying that the silicon may be any amount below .6% the British patentee made it amply clear that the steel may be either killed or unkilled, and in view of this fact the applicant is merely claiming one type of steel of the general analysis disclosed in the British patent. Obviously such a selection of a range of alloys within an old .and broader range does not amount to invention.

"The applicant argues, however, that the British patentee failed to realize that there is a critical range below .6% and that he would not use such a low amount of Si as to leave the steel in the unkilled state because he was concerned with the production of steel rails. It may be admitted that sufficient Si would be used to kill the steel when it is to be rolled into rails, however, it is clear that the British patentee realized that his invention is not limited to railroad rails, where rigid specifications requiring a very dense steel are maintained, and he has therefore disclosed that the advantages of his invention can be obtained as long as the Si is maintained below .6%. The examiner also agrees with the applicant that when the steel contains such a low amount of Si that it is unkilled, it does not have quite the same properties as a killed steel, however, this is well known to the skilled metallurgist and the question whether the steel should be left in the killed or in the unkilled state will depend upon the use to which the steel is to be applied, and upon economic considerations, as shown on pages 786 and 787 of the Metals Handbook. In this connection attention is also respectfully directed to page 3 of the specification, where the applicant admits that it is well recognized that killed steel affords certain advantages over unkilled steel and vice versa, and to the applicant's own description of the properties of his steel, on page 6 of the specification, which shows that his steel merely exhibits the well recognized properties of semi-killed or rimmed steels. In other words, it is clear from the applicant's own specification and from the description of the properties of semi-killed and rimmed steels on pages 786 and 787 of the Metals Handbook, that the applicant obtains no unobvious results by leaving the steel of the British patent in the unkilled state."

After appellant had taken his appeal to the Board of Appeals he filed two affidavits and the application was thereupon remanded to the Primary Examiner under the

provisions of rule 138 for reconsideration under rule 76.

In his supplemental statement after remand the examiner analyzed the subject matter of the affidavits and adhered to his former action rejecting the said claims, summarizing as follows:

"In conclusion the examiner would like to point out that although the examiner bases his rejection on the very simple thesis that it involves no invention to leave the steel of the British patent in the unkilled state because (1) it is old and common to leave steels in this state; (2) that the advantages that such practice affords are admittedly well known, and (3) that the applicant's practice produces only these well known advantages, the applicants eighteen (18) page brief and the two affidavits fail to present a single definitely established experimental fact to show that the results obtained by leaving the steel of the British patent in the unkilled state would not be expected by a person skilled in this art."

The Board of Appeals, while it made no mention of the affidavits, or direct reference to the Metals Handbook, agreed with the reasoning of the examiner.

The issue here is whether it would be obvious to one skilled in the art of metallurgy in view of the references to leave the steel disclosed in the British patent in an unkilled state.

There can be no question in view of the Metals Handbook reference that unkilled steel was old in the art. Further, it is clear that the range of components shown and claimed in the British patent includes the range shown in the application. It will be noted that the only variation is the manner in which the silicon content is described in the British patent.

It is quite true that the British patent does not state in so many words that the steel is killed, but from the record here we think it fair to state that apparently, in the use of silicon content over the maximum quantity disclosed by appellant, the steel of the patent is killed. However, unless we are able to hold that the silicon content in a quantity small enough, within the range shown and claimed by the British patent, which would produce unkilled low alloy steel, results in a steel different from that which is claimed by appellant the decision appealed from must be affirmed. The mere fact that the steel of the British patent had to be killed in reaching the desired product of that patent cannot of itself, in our opinion, indicate that there is invention in leaving the steel unkilled where it is desirable for a different purpose, if there is a suggestion in the prior art of the desirability of leaving steel unkilled for that different purpose. This is admitted in the specification of the application.

Appellant contends that alloy steels are not to be considered as being in the same field as plain carbon steels, which are the steels seemingly mentioned in the Metals Handbook. It may be taken for granted that the properties of plain carbon steel differ from the properties of an alloy steel for the reason that the latter is purposely produced so that it will have properties different from those of plain carbon steel. But we do not think from the mere fact that different properties are possessed by those two kinds of steel it necessarily follows that teachings with respect to one kind may not be applicable with respect to the other. In other words, we do not think the knowledge possessed by metallurgists with respect to one alloy is entirely irrelevant as to another. Moreover, there is nothing contained in the record to indicate that such is the case. Neither is there anything in the record from which we may infer that the product claimed by appellant is a different metal than that which can be produced by reducing the range of the silicon disclosed and claimed in the British patent to that claimed by appellant.

Appellant contends it is well known in the art that a certain quantity of silicon will kill steel. If that is obvious to the metallurgist we think, as is argued in the brief of the Solicitor, it also must be obvious "where the dividing line as to the percentage of silicon necessary to kill the steel lies."

There is no doubt that the range of silicon disclosed in the British patent includes the range set out in the claims herein. We cannot see from the record herein that the British patentee did not have in mind the production of unkilled low alloy steel as well as that of the killed variety, for its specification and its claim clearly disclose that steel identical with that claimed by appellant may be produced.

Appellant relies heavily on the case of Becket v. Coe, Commissioner of Patents, 69 App.D.C. 51, 98 F.2d 332. An examination of the decision in that case reveals that it was based upon the principle that

the steel of the appellant had novel proportions which were critical. There are many cases where critical proportions lend patentability to claims. However, such proportions must involve something over and above that which is obvious to the worker skilled in the art.

We have examined the other cases cited by appellant but in view of our conclusion do not deem it necessary to discuss them.

We are of opinion, as has been heretofore pointed out, that since unkilled steel was well known to the art it would not involve exercise of the inventive faculty to leave the steel of the British patent in an unkilled state if it were desirable to produce a low alloy steel. We find nothing in the affidavits presenting any facts which would justify us in holding them to be more pertinent than they were held to be by the Primary Examiner.

For the reasons hereinbefore stated the decision of the Board of Appeals is affirmed.

Affirmed.